# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                    )
YILKAL BEKELE, on behalf of himself and   )
all others similarly situated,      )
                                    )
        Plaintiff,                  )
                                    )        Civil Action No.
        v.                          )        15-11650-FDS
                                    )
LYFT, INC.,                         )
                                    )
        Defendant.                  )
_____ )
```

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION
## TO COMPEL ARBITRATION AND DISMISS THE COMPLAINT

SAYLOR, J.

This is a putative class action arising out of a ride-sharing company's alleged misclassification of its drivers as independent contractors. Jurisdiction is based on diversity of citizenship. Plaintiff Yilkal Bekele has brought suit individually and on behalf of other individuals working as drivers in Massachusetts for defendant Lyft, Inc. The complaint alleges that Lyft has wrongfully classified its drivers as independent contractors, rather than employees, in violation of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148B. Bekele seeks a declaratory judgment that Lyft drivers are employees under Massachusetts law, as well as damages for unpaid wages and other forms of restitution.

Lyft has moved to compel arbitration and dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) and the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* Lyft contends that when Bekele agreed to Lyft's "clickwrap" Terms of Service Agreement, he agreed to a valid arbitration provision requiring him to submit "any legal disputes or claims arising out of or related to [Lyft's Terms of Service Agreement]" to binding individual arbitration. Bekele contends that the

agreement is invalid because he did not receive adequate notice of the arbitration provision, and did not assent to it.  He also contends that the agreement is unenforceable under the FAA because it is unconscionable under Massachusetts law and illegal under the National Labor Relations Act.

During oral argument, the parties agreed that Lyft's motion to compel arbitration and dismiss the complaint should be converted into a motion for partial summary judgment concerning arbitrability.  For the reasons set forth below, Lyft's motion to compel arbitration will be granted and the action will be dismissed.

## I.   Background

### A.   Factual Background

Unless otherwise noted, the following facts concerning arbitrability are undisputed.

#### 1.   The Parties

Defendant Lyft, Inc. is a California-based company that facilitates peer-to-peer ride-sharing through a mobile-phone application ("the App").  (Still Decl. ¶ 4).  After downloading the App, passengers can request a ride through it and Lyft drivers can elect to pick them up. (*Id.*).  Plaintiff Yilkal Bekele is a Massachusetts resident who has worked as a Lyft driver since August 2014.  (Compl. ¶ 5).

The complaint alleges that Lyft has misclassified its drivers as independent contractors in violation of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148B.[1]  It alleges that as a result of that misclassification, drivers must pay for expenses that their employer Lyft should pay for, including costs of vehicle ownership and maintenance, gas, and insurance.  (*Id.* ¶ 2).

---

[1] According to the complaint, Bekele exhausted his administrative remedies under the Wage Act by filing his statutory claims with the attorney general and obtaining a right-to-sue letter.  (Compl. ¶ 14).

2.     **Lyft's Registration Process**

In order to use Lyft as a passenger or a driver, a user must complete Lyft's registration process.  (Still Decl. ¶ 7).  To begin the registration process, both prospective passengers and prospective drivers are required to download the App.  (*Id.*).  Once a user downloads and opens the App, he or she is prompted to enter either a mobile-phone number or Facebook-profile credentials and to follow further registration steps.  (*Id.* ¶¶ 7-9).  After those registration steps, a user must agree to Lyft's Terms of Service Agreement ("TOS") to complete the registration process.  (*Id.* ¶ 10).  The text of the TOS appears on the user's screen; the user can scroll through the entire agreement on the screen.  (*Id.* ¶ 12).  At the bottom of the TOS, the App presents the following requirement:  "Please agree to the Terms of Service to continue."  (*Id.*).

All users must click the "I accept" button to accept the TOS and begin using the App.  (*Id.*).  A user, regardless of whether he or she is a passenger or driver, cannot complete the registration process or use the App without accepting the TOS.  (*Id.*).  After the user's acceptance of the TOS, he or she can request a ride as a passenger or begin the application process to become a Lyft driver.  (*Id.*).

3.     **Lyft's Terms of Service Agreement**

When a user electronically accepts Lyft's TOS by clicking "I accept," the company is notified of the date and time of his acceptance.  (*Id.* ¶ 13).  Lyft stores and maintains the registration records of its users.  (*Id.*).  According to Lyft's records, Bekele successfully registered for Lyft by electronically agreeing to the TOS on three occasions:  May 19, 2014; September 24, 2014; and October 11, 2014.  (*Id.* ¶ 14; Def. Exs. 1-3).[2]

The TOS in effect on May 19 was dated May 8, and the TOS in effect on September 24

---

[2] Bekele accepted the TOS at 11:45 a.m. on May 19, 10:07 a.m. on September 24, and 12:25 p.m. on October 11.  (Brannstrom Decl. ¶¶ 10-12).  It is unclear why he registered three times in the span of five months.

and October 11 was dated July 28.  (Gallagher Decl. ¶¶ 5-6; *id.* Exs. 2, 3).  Although the two

versions of the TOS accepted by Bekele have slight differences, they contain identical arbitration

provisions.  (*Id.* ¶ 7; *Compare id.* Ex. 2 at 13, *with* Ex. 3 at 21-22).  For the purposes of this

motion, the parties agree that the last version of the TOS agreed to by Bekele—the July 28 TOS

accepted by Bekele on October 11—is the controlling agreement.

In print format, the TOS agreed to by Bekele on October 11, 2014, is 33 pages long and

contains headings that separate sections.  On page 2 of the TOS, the agreement provides as

follows:

> IF YOU DO NOT AGREE TO BE BOUND BY THE TERMS AND
> CONDITIONS OF THIS AGREEMENT, PLEASE DO NOT USE OR ACCESS
> LYFT OR REGISTER FOR THE SERVICES PROVIDED ON LYFT.  We may
> amend this Agreement at any time by posting the amended terms on the Lyft
> Platform.  If We post amended terms on the Lyft platform, You may not use the
> Services without accepting them.  Except as stated below, all amended terms shall
> automatically be effective after they are posted on the Lyft Platform.  This
> Agreement may not be otherwise amended except in writing signed by You and
> Lyft.

(*Id.* Ex. 3 at 2).

Most critical to this dispute, the agreement contains the following arbitration provision,

beginning on page 21:

## AGREEMENT TO ARBITRATE ALL DISPUTES AND LEGAL CLAIMS

> You and We agree that any legal disputes or claims arising out of or related to the
> Agreement (including but not limited to the use of the Lyft Platform and/or the
> Services, or the interpretation, enforceability, revocability, or validity of the
> Agreement, or the arbitrability of any dispute), that cannot be resolved informally
> shall be submitted to binding arbitration in the state in which the Agreement was
> performed.  The arbitration shall be conducted by the American Arbitration
> Association under its Commercial Arbitration Rules (a copy of which can be
> obtained <u>here</u> [hyperlink]), or as otherwise mutually agreed by you and we [sic].
> Any judgment on the award rendered by the arbitrator may be entered in any court
> having jurisdiction thereof.  Claims shall be brought within the time required by
> applicable law.  You and we agree that any claim, action or proceeding arising out
> of or related to the Agreement must be brought in your individual capacity, and

not as a plaintiff or class member in any purported class, collective, or representative proceeding.  The arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative, collective, or class proceeding.  YOU ACKNOWLEDGE AND AGREE THAT YOU AND LYFT ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION OR REPRESENTATIVE PROCEEDING.

(*Id.* at 21-22).  Beginning on page 24, the agreement provides as follows:

**GENERAL**

This Agreement shall be governed by the laws of the State of California without regard to choice of law principles.  If any provision of this Agreement is held to be invalid or unenforceable, such provision shall be struck and the remaining provisions shall be enforced. . . .  This Agreement sets forth the entire understanding and Agreement between the User and Lyft with respect to the subject matter hereof.

(*Id.* at 24-25).

The image below shows how the Lyft TOS appears on a mobile-device screen, although

not to scale:



(Brannstrom Decl. ¶ 7).  "The user has the opportunity to scroll all the way through the text" of

the TOS, and the "I accept" button remains at the bottom of the screen while scrolling.  (*Id.*).

Bekele states that he "used [his] iPhone to get signed up on Lyft's system."  (Bekele Aff. ¶ 3).  He does not dispute that he accepted Lyft's TOS by clicking the "I accept" button.  He states, however, that he does not recall seeing the arbitration provision on any of the three dates that he accepted the TOS.  (*Id.* ¶¶ 3, 7).  He further contends that even if the arbitration provision was displayed, he doubts that he would have been able to read it easily on his phone's small screen.  (*Id.* ¶ 4).

### B.    <u>Procedural Background</u>

Bekele, proceeding on behalf of himself and all other Lyft drivers in Massachusetts, filed the class action complaint on March 17, 2015, in the Massachusetts Superior Court.  On April 21, 2015, Lyft removed the proceeding to this Court.  The complaint alleges that Lyft has misclassified its drivers in Massachusetts as independent contractors, in violation of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148B.

On April 28, 2015, Lyft moved to compel arbitration and dismiss the complaint.  On four separate occasions from June to December, the parties moved to continue the hearing on Lyft's motion.  In December 2015, the parties requested a stay pending the outcome of a related lawsuit against Lyft in California.  In May 2016, the parties finally moved to lift the stay and filed supplemental briefs.

Both parties have submitted various declarations and exhibits outside the pleadings. During the motion hearing, the parties agreed that the Court should convert Lyft's motion into a motion for partial summary judgment as to arbitrability, and that no further evidentiary hearing or submission was necessary.  *See* Fed. R. Civ. P. 12(d).

## II.  **Legal Standard**

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, governs the enforcement of written

arbitration agreements implicating interstate commerce.  *See Circuit City Stores, Inc. v. Adams*,

532 U.S. 105, 119 (2001) (holding that the FAA extends to employment cases for employees

other than those engaged in transportation of goods).  "Congress enacted the FAA in response to

widespread judicial hostility to arbitration."  *American Express Co. v. Italian Colors Rest.*, ——

U.S. ——, 133 S. Ct. 2304, 2308-09 (2013) (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S.

333, 339 (2011)).  Section 2 is the "primary substantive provision of the Act."  *Moses H. Cone*

*Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  It provides, in relevant part, as

follows:

> A written provision in . . . a contract evidencing a transaction involving commerce
> to settle by arbitration a controversy thereafter arising out of such contract or
> transaction . . . shall be valid, irrevocable, and enforceable, save upon such
> grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

The Supreme Court has "described this provision as reflecting both a 'liberal federal

policy favoring arbitration,' and the 'fundamental principle that arbitration is a matter of

contract.'"  *Concepcion*, 563 U.S. at 339 (quoting *Moses H. Cone*, 460 U.S. at 24; *Rent-A-Ctr.,*

*W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)).  In line with those principles, "courts must place

arbitration agreements on an equal footing with other contracts."  *Id.*  They must also

"'rigorously enforce' arbitration agreements according to their terms."  *Italian Colors Rest.*, 133

S. Ct. at 2309 (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).

"The final phrase of § 2, however, permits arbitration agreements to be declared

unenforceable 'upon such grounds as exist at law or in equity for the revocation of any

contract.'"  *Concepcion*, 563 U.S. at 339 (quoting 9 U.S.C. § 2).  That savings clause allows

arbitration agreements to be invalidated by "'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Id.* (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).  Furthermore, the FAA's requirement that arbitration agreements be enforced according to their terms "holds true for claims that allege a violation of a federal statute, unless the FAA's mandate has been 'overridden by a contrary congressional command.'" *Italian Colors Rest.*, 133 S. Ct. at 2309 (quoting *CompuCredit Corp. v. Greenwood*, —— U.S. ——, 132 S. Ct. 665, 669 (2012)).

In short, arbitration agreements that are validly formed under state contract law must be enforced according to their terms under Section 2 of the FAA, unless one of two exceptions applies.  First, an arbitration agreement may be invalidated on any ground that would make a contract unenforceable, such as unconscionability or illegality.  *Concepcion*, 563 U.S. at 339.  Second, the application of the FAA may be precluded by another federal statute's contrary command.  *CompuCredit*, 132 S. Ct. at 669.

"A party who is seeking to compel arbitration must demonstrate that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope."  *Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 474 (1st Cir. 2011). (citation and internal quotation marks omitted).  "Whether or not a dispute is arbitrable is typically a question for judicial determination."  *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 375 (1st Cir. 2011).  "Therefore, 'except where the parties clearly and unmistakably provide otherwise, it is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning a particular matter.'"  *Id.* (quoting

*Granite Rock Co. v. International Bhd. of Teamsters*, 561 U.S. 287, 299 (2010)).[3]

When an enforceable arbitration agreement exists between the parties, a court may enforce that agreement by staying existing litigation pending arbitration, 9 U.S.C. § 3, or compelling the parties to arbitrate and dismissing the action, 9 U.S.C. § 4.  *See DeLuca v. Bear Stearns & Co.*, 175 F. Supp. 2d 102, 106-07 (D. Mass. 2001).

## III.   Analysis

Lyft contends that its motion to compel arbitration should be granted because (1) Bekele received notice of and assented to a valid written agreement to arbitrate and (2) his claims under the Massachusetts Wage Act fall within the scope of the arbitration agreement's broad language.

Bekele contends that Lyft's motion to compel arbitration should be denied for two reasons.  First, he contests the validity of the agreement.  He contends that Lyft has failed to meet its burden of demonstrating that he received reasonable notice of, and manifested his assent to, the arbitration provision.  Second, he raises two affirmative defenses, unconscionability and illegality, under the FAA's savings clause.  He contends that even if the arbitration agreement is

---

[3] Here, Lyft's TOS contains the following delegation clause concerning arbitrability:

> You and We agree that any legal disputes or claims arising out of or related to the Agreement (including but not limited to . . . *the arbitrability of any dispute*), that cannot be resolved informally shall be submitted to binding arbitration in the state in which the Agreement was performed.

(Gallagher Decl. Ex. 3 at 22) (emphasis added).  The validity and enforceability of an arbitration agreement's delegation clause is usually a threshold issue for the court to address, and if it is valid and enforceable, it is the only issue the court will reach.  *See, e.g.*, *Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945, 966 (N.D. Cal. 2015) (granting defendant's motion to compel arbitration after concluding that delegation clause was not unconscionable and that "[t]he arbitration provision itself clearly and unambiguously delegates both arbitrability and enforceability of the arbitration provision to the arbitrator"); *Mohamed v. Uber Techs., Inc.*, 109 F. Supp. 3d 1185, 1199-1217 (N.D. Cal. 2015) (before reaching the enforceability of the arbitration provision, discussing whether the delegation clause was clear and unmistakable or unconscionable).

Here, however, Lyft did not address the delegation clause in its briefing and expressly waived that argument during the hearing.  Accordingly, "it is the [C]ourt's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning a particular matter."  *Dialysis Access Ctr.*, 638 F.3d at 375 (internal quotation marks omitted).

valid, it is unenforceable as procedurally and substantively unconscionable.  He also contends

that the agreement is unenforceable as illegal because its class-waiver provision violates the

NLRA.  The Court will address each issue in turn, beginning with the validity of the agreement

before turning to its enforceability and scope.

### A.     Validity of Agreement

The first step in determining whether Bekele's claims should be resolved by arbitration is

deciding "whether  . . . there exists a written agreement to arbitrate."  *Lenfest v. Verizon Enter.*

*Sols., LLC*, 52 F. Supp. 3d 259, 262-63 (D. Mass. 2014).  "This is the first step of the analysis

because, if the contract containing the arbitration agreement was never binding on the plaintiff[],

the arbitration clause cannot be enforced against [him]."  *Cullinane v. Uber Techs., Inc.*, 2016

WL 3751652, at *4 (D. Mass. July 11, 2016).

To determine whether a valid agreement to arbitrate exists, federal courts generally

"apply ordinary state-law principles that govern the formation of contracts."  *First Options of*

*Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Campbell v. General Dynamics Gov't*

*Sys. Corp.*, 407 F.3d 546, 552 (1st Cir. 2005) (explaining that "principles of state contract law

control the determination of whether a valid agreement to arbitrate exists").  Under

Massachusetts law, the formation of a contract requires a definite offer, acceptance, and

consideration.  *Vadnais v. NSK Steering Sys. Am., Inc.*, 675 F. Supp. 2d 205, 207 (D. Mass.

2009).  Formation of a contract is judged by the objective conduct of the parties, rather than their

subjective intent.  *Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc.*, 68 Mass.

App. Ct. 582, 596 n.35 (2007).  A contract may be binding on an employee in the context of an

at-will employment relationship even if the agreement is not express and in writing.  *See, e.g.*,

*Ellerbee v. Gamestop, Inc.*, 604 F. Supp. 2d 349, 354 (D. Mass. 2009) (citing *O'Brien v. New*

*England Tel. Co.*, 422 Mass. 686, 691 (1996)).  An employee's "continued employment [may] constitute[ ] adequate consideration for the contract."  *Id.* (citing *O'Brien*, 442 Mass. at 691).[4]

Under Massachusetts law, the issue of whether the parties validly entered into an arbitration agreement depends on whether "[d]efendant gave 'some minimal level of notice to the employee that statutory claims are subject to arbitration.'"  *Id.* (quoting *Campbell*, 407 F.3d at 554).  "This is an objective test:  'the sufficiency of the notice turns on whether, under the totality of the circumstances, the employer's communication would have provided a reasonably prudent employee notice of the waiver [of the right to proceed in a judicial forum].'"  *Id.* (quoting *Campbell*, 407 F.3d at 555).

"When it comes to specific clauses in [online] adhesion contracts," as is the case here, "under Massachusetts law, courts 'have held that such clauses will be enforced provided they have been *reasonably communicated* and *accepted*, and if, considering all the circumstances, it is reasonable to enforce the provision at issue.'"  *Cullinane*, 2016 WL 3751652, at *5 (emphasis added) (quoting *Ajemian v. Yahoo!, Inc.*, 83 Mass. App. Ct. 565, 573-74 (2013)).  As the Massachusetts Court of Appeals has explained in the context of forum-selection clauses in online

---

[4] Although the Lyft TOS contains a California choice-of-law provision, Massachusetts choice-of-law rules apply to the validity of the arbitration agreement.  "Because the Agreement's choice-of-law provision does not apply to the validity of the contract's formation, Massachusetts choice-of-law rules will directly determine which state's law does apply."  *NPS, LLC v. Ambac Assurance Corp.*, 706 F. Supp. 2d 162, 168 (D. Mass. 2010); *accord Foodmark, Inc. v. Alasko Frozen Foods, Inc.*, 2013 WL 1285539, at *8 (D. Mass. Mar. 26, 2013) ("It would be odd to apply a contractual choice-of-law clause when determining whether any part of the contract is valid in the first instance.").

Under Massachusetts choice-of-law rules, Massachusetts law quite clearly applies to the determination of the validity of the arbitration clause.  "Massachusetts has adopted a 'functional choice-of-law approach,' which focuses on 'the interests of the parties, the States involved, and the interstate system as a whole.'"  *NPS*, 706 F. Supp. 2d at 168 (quoting *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985)).  "One guiding principle is the identification of that state which has the 'the most significant relationship to the transaction and the parties.'"  *Id.* (quoting Restatement (Second) of Conflict of Laws § 188(1) (1971)).  Here, Massachusetts has the most significant relationship to the agreement between Bekele and Lyft.  Bekele is a Massachusetts resident who accepted Lyft's TOS in Massachusetts and drove for Lyft in Massachusetts.  Accordingly, Massachusetts law applies to the validity of the TOS agreement, as well as to Bekele's affirmative defense of unconscionability.

"clickwrap" contracts:

> Although forum-selection clauses contained in online contracts have been enforced, courts have done so only where the record established that the terms of the agreement were displayed, *at least in part*, on the user's computer screen and the user was required to signify his or her assent by *"clicking" "I accept."*

*Ajemian*, 83 Mass. App. Ct. at 576 (emphasis added).

Accordingly, the burden falls on Lyft to demonstrate (1) that the arbitration provision was reasonably communicated to Bekele, and (2) that Bekele manifested assent to its terms. *See Acher v. Fujitsu Network Commc'ns, Inc.*, 354 F. Supp. 2d 26, 36 (D. Mass. 2005) ("The party seeking to compel arbitration . . . has the burden of proving . . . the existence of a valid and binding agreement to arbitrate.").[5]

### 1.   <u>Reasonable Notice</u>

Bekele contends that the arbitration provision was not reasonably communicated to him because "Lyft has failed to disclose whether the terms of its agreement were ever displayed to its drivers, including Mr. Bekele, and has not shown how prominently the hyperlink was displayed (or whether Mr. Bekele actually clicked on it)."  (Pl. Mem. 7).  That argument, however, misconstrues the nature of the TOS.  The TOS is undoubtedly a "clickwrap" agreement, a contract "in which . . . users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use." *Cullinane*, 2016 WL 3751652, at *6 (internal quotation marks omitted).  It is not, however, a "browsewrap" agreement, "where the [hyper]link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it." *Id.* at *5 (internal quotation marks omitted).

Massachusetts courts have routinely concluded that clickwrap agreements—whether they

---

[5] *See also Cullinane*, 2016 WL 3751652, at *6 ("The party seeking to enforce the contract has 'the burden of establishing, on undisputed facts, that the provisions of the TOS were reasonably communicated and accepted.'" (quoting *Ajemian*, 83 Mass. App. Ct. at 573)).

contain arbitration provisions or other contractual terms—provide users with reasonable communication of an agreement's terms.  *See, e.g.*, *Ajemian*, 83 Mass. App. Ct. at 576 (noting that "forum-selection clauses have almost uniformly been enforced in clickwrap agreements").[6] One court in this district recently concluded that the arbitration provision in the TOS of Uber, a Lyft competitor, was reasonably communicated to plaintiffs even though (1) the TOS could be viewed only through a hyperlink (the terms did not automatically appear on the screen as Lyft's do), and (2) the arbitration provision appeared on the penultimate page of the TOS.  *See Cullinane*, 2016 WL 3751652, at *7.  The court explained:

> Whether or not plaintiffs had *actual* notice of the terms of the Agreement, all that matters is that plaintiffs had *reasonable* notice of the terms.  "In Massachusetts courts, it has long been the rule that '[t]ypically, one who signs a written agreement is bound by its terms whether he reads and understands them or not.'" *Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36, 44 (1st Cir. 2012) ("*Awuah II*") (quoting *St. Fleur v. WPI Cable Sys./Mutron*, 450 Mass. 345, 355 (2008)).  The placement of the phrase "By creating an Uber account, you agree to the Terms of Service & Privacy Policy" on the final screen of the account registration process is prominent enough to put a reasonable user on notice of the terms of the Agreement.  Although the paragraph under the heading of "Dispute Resolution" does not appear until the 8th or 9th page (depending on when a user accessed it), the heading is in bold and much larger than the non-heading text in the rest of the Agreement.  A reasonable user who cared to pursue the issue would have inquiry notice of the terms of the Agreement challenged by the plaintiffs.

*Id.*  In short, "[t]he test to be applied in Massachusetts is reasonable notice."  *Id.*[7]

---

[6] As one court in this district recently concluded:

Clickwrap agreements permit courts to infer that the user was at least on inquiry notice of the terms of the agreement, and has outwardly manifested consent by clicking a box.  *As a result, because the user has signed the contract by clicking 'I agree,' every court to consider the issue has held clickwrap licenses enforceable.*

*Cullinane*, 2016 WL 3751652, at *6 (emphasis added) (internal quotation marks and alterations omitted); *see also i.LAN Sys., Inc. v. Netscout Serv. Level Corp.*, 183 F. Supp. 2d 328, 338 (D. Mass. 2002) (noting that "clickwrap . . . agreements are an appropriate way to form contracts"); *Hughes v. McMenamon*, 204 F. Supp. 2d 178, 181 (D. Mass. 2002) (explaining that clickwrap agreements "have been upheld as valid and enforceable").

[7] In *Meyer v. Kalanick*, —— F. Supp. 3d ——, 2016 WL 4073012, at *7 (S.D.N.Y. July 29, 2016), Judge Rakoff recently held that Uber's arbitration provision in an antitrust-conspiracy consumer class action was not

Contrary to Bekele's arguments, Lyft's arbitration agreement was not "buried" on another screen or hidden by a hyperlink.  (Pl. Supp. Mem. 15).  Rather, the entire TOS, including the arbitration provision, was displayed on a user's screen, with prominent bold headings.  Moreover, the App allowed users to scroll all the way through the TOS.  On the second page, the TOS stated, in all capital letters:  "IF YOU DO NOT AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT, PLEASE DO NOT USE OR ACCESS LYFT OR REGISTER FOR THE SERVICES PROVIDED BY LYFT."  Furthermore, the arbitration provision itself was set off by a large bold heading stating "**AGREEMENT TO ARBITRATE ALL DISPUTES AND LEGAL CLAIMS**."  It concluded, again in all capital letters:  "YOU ACKNOWLEDGE AND AGREE THAT YOU AND LYFT ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION . . . ."

Lyft's arbitration provision was communicated in a more prominent manner than Uber's arbitration provision in *Cullinane*.  Furthermore, whereas the *Ajemian* court noted that an agreement is reasonably communicated if the terms are displayed "at least in part" on a user's screen, Lyft's TOS was displayed in its entirety on the screen.  Under the circumstances—and particularly in light of the weight of Massachusetts authority holding that clickwrap agreements

---

prominent enough to provide users with reasonable notice.  However, the court contrasted the Uber interface used by the plaintiffs in *Cullinane* with the one used by the plaintiffs in that case:

> However, in the user interface that some of the *Cullinane* plaintiffs faced, the clickable box with the phrase "Terms of Service & Privacy Policy" was clearly delineated, and the words appeared in bold white lettering on a black background, in a size similar to, if not larger than, the size of the "Done" button that users clicked in order to register.  In the instant case, by contrast, the phrase "Terms of Service & Privacy Policy" is much smaller and more obscure, both in absolute terms and relative to the "Register" button.

*Id.* (citation omitted).

such as Lyft's provide reasonable notice to users—Lyft has satisfied its burden of demonstrating

that the TOS provided Bekele with reasonable notice of its arbitration provision.

### 2.   Manifestation of Assent

Bekele next contends that "it is not even clear that [he] actually agreed to the arbitration

agreement at issue, as he has no recollection of agreeing to it, and Lyft has not definitely shown a

valid acceptance."  (Pl. Mem. 4).

In the context of clickwrap agreements, "[c]ourts view the clicking of an 'I agree' or 'I

accept' box (or similar mechanism) as a requirement that the user *manifest assent* to the terms

and conditions expressly before she uses the website or services covered by the agreement."

*Cullinane*, 2016 WL 3751652, at *6 (emphasis added) (internal quotation marks omitted).

"Clickwrap agreements permit courts to infer that the user . . . has outwardly manifested consent

by clicking a box."  *Id.* (internal quotation marks omitted).  "As a result, because the user has

'signed' the contract by clicking 'I agree,' every court to consider the issue has held clickwrap

licenses enforceable."  *Id.* (internal quotation marks omitted).  In *Cullinane*, the court concluded

that the Uber users manifested assent to the TOS even though the button on their screen simply

stated "Done."  *Id.* at *8.  The court explained:

> The language surrounding the button leading up to the Agreement is unambiguous
> in alerting the user that creating an account will bind her to the Agreement.  And
> the word "Done," *although perhaps slightly less precise than* "*I accept,*" *or* "*I
> agree,*" makes clear that by clicking the button the user has consummated account
> registration, the very process that the notification warns users will bind them to
> the Agreement.

*Id.* (emphasis added).

There is little question that Lyft has satisfied its burden of demonstrating that Bekele

manifested assent to the TOS.  Indeed, it has done so three times over, by showing that Bekele

clicked the prominent "I accept" button at the bottom of the TOS on three separate occasions.

*See Ajemian*, 83 Mass. App. Ct. at 576 (noting that courts should enforce a clickwrap agreement when "the user was required to signify his or her assent by 'clicking' 'I accept.'").  And in its second paragraph, the Lyft TOS states as follows:

> Lyft is willing to license, not sell, the Lyft Platform to You only upon the condition that You accept all of the terms contained in this Agreement.  By signing up with or by using the Lyft Platform, You indicate that You understand this Agreement and accept all of its terms.  If You do not accept all of the terms of this Agreement, then Lyft is unwilling to license the Lyft Platform to You.

(Gallagher Decl. Ex. 3 at 1).  Accordingly, the implications of clicking the "I accept" button were clear.  In the words of the court in *Cullinane*, Lyft's "I accept" button was even more "precise" than Uber's "Done" button.  Accordingly, based on the undisputed facts, Lyft has sufficiently demonstrated that Bekele manifested assent to Lyft's TOS and its arbitration provision.

### 3.      Conclusion as to Validity of Agreement

For the foregoing reasons, the undisputed facts demonstrate that Lyft provided Bekele with more than reasonable notice of its arbitration provision, and that Bekele assented to that provision.  Accordingly, the parties reached a valid written arbitration agreement.

The remaining issue is whether Bekele has demonstrated that the arbitration agreement is unenforceable under the FAA's savings clause, that is, "upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.[8]

### B.      Enforceability of Agreement

Bekele contends that the arbitration agreement is unenforceable under the FAA's savings

---

[8] Bekele does not contest that the FAA applies to this case.  His agreement with Lyft, a California company, implicates interstate commerce.  *See Southland Corp. v. Keating*, 465 U.S. 1, 17-18 (1984) ("The general rule prescribed by § 2 of the [FAA] is that arbitration clauses in contracts involving interstate transactions are enforceable as a matter of federal law."); *Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. & Sys. Co.*, 643 F.2d 863, 867 (1st Cir. 1981) (holding that the term "commerce" in the FAA is to be "broadly construed").

clause for two reasons.  First, he contends that it is both procedurally and substantively

unconscionable under Massachusetts state law.  Second, he contends that the arbitration

provision's class-action waiver is illegal because it violates a substantive protected right under

the NLRA.

"In considering whether [the] agreement to arbitrate is unenforceable, [the Court is]

mindful of the FAA's purpose 'to reverse the longstanding judicial hostility to arbitration

agreements . . . and to place arbitration agreements upon the same footing as other contracts.'"

*Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 89 (2000) (quoting *Gilmer v.*

*Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)).  "[E]ven claims arising under a statute

designed to further important social policies may be arbitrated because 'so long as the

prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral

forum,' the statute serves its functions."  *Id.* (quoting *Gilmer*, 500 U.S. at 28).

Courts have consistently placed the burden of persuasion on parties raising affirmative

defenses to arbitration agreements under the FAA.  *See, e.g.*, *Rosenberg v. Merrill Lynch, Pierce,*

*Fenner & Smith*, 170 F.3d 1, 17 (1st Cir. 1999) ("[Plaintiff] . . . argue[s] that the arbitration

agreement should not be enforced because it is unconscionable . . . .  We reject these

arguments . . . because the law has long imposed a *heavy burden* on those who make such

arguments and [plaintiff] has not met her burden of proof." (emphasis added)); *Barrasso v.*

*Macy's Retail Holdings, Inc.*, 2016 WL 1449567, at *5 (D. Mass. Apr. 12, 2016) ("To prove that

the terms of a contract are unconscionable, a plaintiff must show both substantive

unconscionability . . . and procedural unconscionability . . . .").[9]

---

[9] The First Circuit has stated on one occasion that under the FAA "[a] *party who is seeking to compel arbitration must demonstrate* that a valid agreement to arbitrate exists, *that the movant is entitled to invoke the arbitration clause, [and] that the other party is bound by that clause . . . .*"  *Soto-Fonalledas*, 640 F.3d at 474 (emphasis added).  It does not appear that the cited language was intended to work a substantive change in the law,

### 1.   Unconscionability under Massachusetts Law

Under Massachusetts law, "[u]nconscionability must be determined on a case-by-case basis, with particular attention to whether the challenged provision could result in oppression and unfair surprise to the disadvantaged party . . . ." *Waters v. Min Ltd.*, 412 Mass. 64, 68 (1992).[10] An unconscionable contract is one "such as no man in his senses and not under delusion would make on the one hand, and no honest and fair man would accept on the other." *Id.* at 69.

"[T]o prove that the terms of a contract are unconscionable, a plaintiff must show both substantive unconscionability (that the terms are oppressive to one party) and procedural unconscionability (that the circumstances surrounding the formation of the contract show that the aggrieved party had no meaningful choice and was subject to unfair surprise)." *Machado v. System4 LLC*, 471 Mass. 204, 218 (2015) (citations and internal quotation marks omitted); *accord Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 294 (1980); *see also Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith*, 170 F.3d 1, 17 (1st Cir. 1999) (explaining that a party raising unconscionability must demonstrate "*both* a lack of meaningful choice about whether to accept the provision in question, and that the disputed provisions were so one-sided as to be oppressive" (emphasis added)).  The test is conjunctive; that is, a party must prove *both* procedural *and* substantive unconscionability to prevail in demonstrating that the agreement is unenforceable. *Zapatha*, 381 Mass. at 293 n.13 ("This two-part test for unconscionability involves determining whether there was an absence of meaningful choice on the part of one of the parties, together

---

to place the burden of persuasion on the party seeking to compel arbitration to disprove affirmative defenses.  In any event, as explained below, even if the burden of persuasion is on Lyft, the arbitration agreement is not unconscionable under Massachusetts state law or illegal under the NLRA.

[10] For the reasons explained above concerning the validity of the agreement to arbitrate, Massachusetts law applies to Bekele's affirmative defense of unconscionability. *See, e.g.*, *Barrasso*, 2016 WL 1449567, at *5 n.5 (applying Massachusetts law in a dispute involving an unconscionability challenge to an arbitration agreement involving a New Hampshire resident who worked for a New York corporation in Massachusetts).

with contract terms which are unreasonably favorable to the other party." (internal quotation marks omitted)).  Whether the arbitration agreement between Lyft and Bekele is unconscionable or not is a question of law that is proper for the Court to decide, *id.* at 291, and Bekele faces a "heavy burden" in prevailing on such a defense.  *See Rosenberg*, 170 F.3d at 17.[11]

Before determining whether Lyft's arbitration provision is unconscionable, some preliminary observations are in order.  First, the Court must focus on whether the arbitration agreement itself is both procedurally and substantively unconscionable, not on whether other specific provisions in the Lyft TOS or the agreement as a whole are unconscionable.  Unless the arbitration clause itself is unenforceable as unconscionable, questions about other provisions in the contract are properly left for arbitration.  *See Hurlbut v. Gantshar*, 674 F. Supp. 385, 390 (D. Mass. 1987) ("Had [plaintiff] established that her challenge went to the arbitration clause alone, the issue would be one for the Court.  On the other hand, disputes as to the entire document are for the arbitrator." (citations omitted)).  Moreover, as the SJC has recently explained, the Court must take note of the severability clause in the TOS:

> Most importantly, however, the enforceability of the confidentiality clause [in the arbitration agreement] is a matter distinct from the enforceability of the arbitration clause in general.  The plaintiffs would still be free to argue during arbitration that the confidentiality clause is not enforceable.
>
> Nevertheless, even if we were to find any of the discussed provisions unconscionable, the franchise agreements contain a severability clause, requiring any unenforceable term to be severed.  This is not the type of case in which illegality pervades the arbitration agreement, nor are the arbitration provisions so one-sided that their *only possible purpose* is to undermine the neutrality of the proceeding.  We are unconvinced that the contested provisions equate to such a level of unconscionability that the arbitration clause should not be enforced.  Not only do the franchise agreements contain a severability clause, but also the plaintiffs identify only one potentially unenforceable provision (confidentiality), which does not infect the arbitration clause as a whole.

---

[11] Again, Lyft has waived any argument that enforceability is a question for the arbitrator to decide under the delegation clause of the TOS.

*Machado*, 471 Mass. at 219-20 (citations and internal quotation marks omitted).[12]

The parties each rely heavily on one recent case addressing the unconscionability issue. Lyft points to *Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945 (N.D. Cal. 2015), in which the court rejected an unconscionability challenge to the same arbitration provision at issue in this case. Bekele contends that *Loewen* is distinguishable, and directs the Court to *Mohamed v. Uber Technologies, Inc.*, 109 F. Supp. 3d 1185 (N.D. Cal. 2015), in which a court found Uber's arbitration provisions procedurally and substantively unconscionable. For multiple reasons, neither case is controlling, and indeed not necessarily instructive. Perhaps the most obvious distinction is that both *Loewen* and *Mohamed* apply California law. Under California law, unconscionability is measured on a "sliding scale" such that "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *See Mohamed*, 109 F. Supp. 3d at 1205. This Court must apply Massachusetts law concerning unconscionability, which imposes a different standard. Furthermore, *Mohamed* involves an entirely different arbitration agreement than the one at issue here.[13] Finally, while it is true that *Loewen* involved the same arbitration agreement as the one challenged here, that case also involved common-law claims for breach of contract, fraud, and negligent misrepresentation, and the court noted multiple times that the

---

[12] The Lyft TOS provides that "[i]f any provision of this Agreement is held to be invalid or unenforceable, such provision shall be struck and the remaining provisions shall be enforced." (Still Decl. Ex. 3 at 24).

[13] *Mohamed* has also been distinguished by other courts that either disagree with its reasoning or conclude that the contracts at issue are not as "permeated with unconscionability" as the contract there. *See, e.g., Sena v. Uber Techs., Inc.*, 2016 WL 1376445, at *3 (D. Ariz. Apr. 7, 2016) (noting that "*Mohamed*, however, is not controlling authority, nor does th[e] Court find its reasoning persuasive"); *see also Varon v. Uber Techs., Inc.*, 2016 WL 1752835, at *3 n.4 (D. Md. May 3, 2016); *Khraibut v. Chahal*, 2016 WL 1070662, at *9 (N.D. Cal. Mar. 18, 2016); *Shierkatz Rllp v. Square, Inc.*, 2015 WL 9258082, at *12 (N.D. Cal. Dec. 17, 2015); *Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1159 (N.D. Cal. 2015).

dispute did not involve "non-waivable statutory employment claims."  129 F. Supp. 3d at 956, 957, 963.

### a.   Procedural Unconscionability

Bekele contends that the arbitration agreement is procedurally unconscionable because "it was buried in a lengthy document that was presented on a tiny smartphone screen and drivers were forced to agree as a condition of continued employment."  (Pl. Supp. Mem. 15).

A contract may be procedurally unconscionable if it is the product of "unfair surprise." *Zapatha*, 381 Mass. at 293-94.  "Such unfair surprise might arise where the provision was 'obscurely worded,' 'buried in fine print in the contract,' or proposed under other circumstances suggesting unfairness."  *Storie v. Household Int'l, Inc.*, 2005 WL 3728718, at *9 (D. Mass. Sept. 22, 2005) (quoting *Zapatha*, 381 Mass. at 293-94).  A contract may also be procedurally unconscionable if the process leading up to its formation is oppressive—that is, if the "circumstances surrounding the formation of the contract show that the aggrieved party had no meaningful choice."  *Id.*  Examples of an oppressive formation process include high-pressure sales tactics, *Waters*, 412 Mass. at 68, or alterations to an employee's existing contract where the "content, the obscurity, and the timing of the [communication] and [] failure to require a response [from employees] raise unconscionability concerns."  *Skirchak v. Dynamics Research Corp.*, 508 F.3d 49, 60 (1st Cir. 2007).[14]

Bekele has not met his burden of demonstrating that the Lyft arbitration provision is

---

[14] *See also Skirchak v. Dynamics Research Corp.*, 432 F. Supp. 2d 175, 180 (D. Mass. 2006) (finding a company's insertion of an arbitration clause into existing employees' contracts procedurally unconscionable because the company "rushed to implement the [arbitration] program in an attempt to protect itself from potential liabilities," as evidenced by e-mailing employees two days before Thanksgiving and notifying them that by returning to work on the following Monday they accepted the arbitration terms).  In *Skirchak*, the First Circuit noted that the e-mail did not indicate that the agreement changed the employees' terms of employment, that the agreement was accessible only by clicking a hyperlink in the e-mail, and that even after clicking the hyperlink, an employee would have to search for the class-action waiver that was "hidden in two paragraphs in a multi-page appendix to a fifteen-page document."  508 F.3d at 61.

"riddled with improprieties in its formation, [is] hidden or obscured in a prolix form, or that it

otherwise ha[s] the potential for unfair surprise."  *Storie*, 2005 WL 3728718, at *9.  As noted, the

arbitration provision is preceded by a clearly-worded, bolded, all-caps header in a font size that

is larger than the text of the provision itself:  "AGREEMENT TO ARBITRATE ALL

DISPUTES AND LEGAL CLAIMS."  The provision is only one paragraph long and uses fairly

clear language.  Furthermore, it concludes, again in all caps, "YOU ACKNOWLEDGE AND

AGREE THAT YOU AND LYFT ARE EACH WAIVING THE RIGHT TO A TRIAL BY

JURY OR TO PARTICIPATE AS A PLAINTIFF OR CLASS MEMBER IN ANY

PURPORTED CLASS ACTION . . . ."  If the print was small, that is because Bekele chose to

display it that way; he could have blown up the text with a swipe of his fingers, or for that matter

read the agreement on a tablet or other larger device.

Nor was Bekele's acceptance of the arbitration provision a product of an oppressive or

unfair process.  Although the provision appeared at page 21 of a 33-page document, there is no

evidence suggesting that Bekele was under pressure to read the TOS quickly, or not read it all.

*See Storie*, 2005 WL 3728728, at *9 (denying motion to reconsider grant of defendant's motion

to compel arbitration, in part because plaintiffs failed to "allege that they had insufficient time to

consider the agreement").  Indeed, Bekele could have taken any period of time he chose to read

the agreement.  He was not a mere consumer, rushing to complete a transaction.  Nor was he an

employee who had to agree to new terms as a condition of continued employment.[15]  Instead, he

---

[15] Although Bekele contends that he was "forced" to agree to the TOS as a "condition of continued
employment," it is clear that he had to agree to the TOS *before* becoming a Lyft driver.  *See Barrasso*, 2016 WL
1449567, at *6 (granting motion to compel arbitration over unconscionability challenge, in part because
"[employee] agreed to the [defendant's] arbitration procedures at the outset of his employment relationship.  This
was an entirely voluntary act—even if economically motivated—and there was no 'gross disparity' in consideration
exchanged by the parties").

was a prospective employee (according to his version of events) about to enter into an

employment relationship.  In short, he had every incentive to read the document, and an

unlimited amount of time in which to do so.[16]

The TOS also required an affirmative response from Bekele by clicking the "I accept"

button.  *See Skirchak*, 508 F.3d at 60 (noting that defendant's failure to require employees to

respond to contract alteration raised procedural unconscionability concerns).  Bekele's

acceptance of the TOS on three separate occasions also weighs against a finding of unfair

surprise or oppressive formation.  *See Zapatha*, 381 Mass. at 294 (noting that plaintiffs had

"ample" time to consider the term before they signed it, especially in light of the fact that they

signed subsequent agreements, identical to the first); *Piantes v. Pepperidge Farm, Inc.*, 875 F.

Supp. 929, 936 (D. Mass. 1995) (denying procedural unconscionability challenge to agreement

and noting that "[plaintiff] ha[d] signed five different versions of the agreement containing [the

allegedly unconscionable provision]").

Finally, to the extent that Bekele contends that contracts of adhesion in employment

contexts are always procedurally unconscionable, that argument is without merit.  *See McInnes v.

LPL Fin., LLC*, 466 Mass. 256, 266 (2013) ("Contracts of adhesion are enforceable *unless* they

are unconscionable, offend public policy, or are shown to be unfair in the particular

circumstances." (emphasis added) (internal quotations and alterations omitted)); *Zapatha*, 381

Mass. at 293 n.12 (same); *accord Barrasso*, 2016 WL 1449567, at *6; *Storie*, 2005 WL

3728718, at *9.  As the First Circuit has noted, "[i]nequality in bargaining power," standing

alone, "'is not a sufficient reason to hold that arbitration agreements are never enforceable in the

---

[16] It is also unclear what alternative method Lyft could have reasonably employed in order to propose the agreement to Bekele.  For example, Lyft might have mailed the agreement to him, and required that he mail it back with a "wet" signature.  But that would not have given him any more time to read the document, and indeed would have conferred no real benefit on him at all.

employment context.'"  *Rosenberg*, 170 F.3d at 17 (quoting *Gilmer*, 500 U.S. at 33).

In sum, there is insufficient evidence of either unfair surprise or oppressive formation practices to conclude that Lyft's arbitration provision is procedurally unconscionable.

### b.      Substantive Unconscionability

Because the arbitration provision is not procedurally unconscionable, under Massachusetts law the Court need not reach the issue of whether its cost-splitting provision and class-action waiver make it substantively unconscionable.[17]  *See Machado*, 471 Mass. at 218 (citing *Storie*, 2005 WL 3728718, at *10) (noting that "to prove that the terms of a contract are unconscionable, a plaintiff must show both substantive unconscionability . . . and procedural unconscionability . . . .").  Accordingly, Bekele has failed to satisfy his "heavy burden" of demonstrating that the arbitration contract that he agreed to is unenforceable under the FAA's savings clause as unconscionable.  *Rosenberg*, 170 F.3d at 17.

### 2.      Illegality under the NLRA

Lyft contends that Bekele must arbitrate his claims on an individual basis because the arbitration provision contains a class-action waiver.  According to Lyft, the Supreme Court has held that such waivers are valid and enforceable as a matter of federal preemption under the FAA.  Bekele contends that Lyft drivers are employees protected by the National Labor Relations Act ("NLRA"), and that class-action waivers in employers' arbitration agreements violate the NLRA.  Until recently, every circuit court to address the invalid-waiver argument had rejected it, relying at least partly on the Supreme Court's decisions in *American Express Co. v. Italian Colors Restaurant*, —— U.S. ——, 133 S. Ct. 2304 (2013), and *AT&T Mobility LLC v.*

---

[17] Bekele also challenges the unilateral-modification provision in the TOS.  However, that provision is not contained in the agreement's arbitration provision; rather, it appears near the beginning of the TOS.  (*See* Still Decl. Ex. 3 at 2).  Accordingly, the unilateral-modification provision is not part of the Court's substantive-unconscionability analysis.

*Concepcion*, 563 U.S. 333 (2011).  However, a circuit split has arisen, and because the First

Circuit has not yet weighed in, further analysis is appropriate.

   **a.**  **<u>Whether Bekele is Protected Under the NLRA</u>**

  For Bekele to prevail on his argument that the class-proceeding waiver in Lyft's

arbitration provision is illegal under the NLRA, he must first establish that he is protected by the

NLRA as an "employee."  Obviously, Lyft classifies its drivers in Massachusetts as independent

contractors, but the complaint alleges that they are misclassified and should be considered

employees.  The Court will assume that Bekele is an employee for purposes of this motion.[18]

   **b.**  **<u>Whether the Class-Proceeding Waiver Violates the NLRA</u>**

  The Lyft arbitration provision to which Bekele agreed reads, in relevant part, as follows:

> You and we agree that any claim, action or proceeding arising out of or related to
> the Agreement must be brought in your individual capacity, and not as a plaintiff
> or class member in any purported class, collective, or representative proceeding.
> The arbitrator may not consolidate more than one person's claims, and may not
> otherwise preside over any form of a representative, collective, or class
> proceeding.  YOU ACKNOWLEDGE AND AGREE THAT YOU AND LYFT
> ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO
> PARTICIPATE AS A PLAINTIFF OR CLASS MEMBER IN ANY
> PURPORTED CLASS ACTION OR REPRESENTATIVE PROCEEDING.

(Still Decl. Ex. 3 at 22).  Bekele contends that the waiver violates Sections 7 and 8 of the NLRA,

and is therefore illegal.  Section 7 provides as follows:

> Employees shall have the right to self-organization, to form, join, or assist labor
> organizations, to bargain collectively through representatives of their own
> choosing, *and to engage in other concerted activities for the purpose of collective
> bargaining or other mutual aid or protection,* and shall also have the right to
> refrain from any or all of such activities except to the extent that such right may
> be affected by an agreement requiring membership in a labor organization as a

---

[18] At least some courts have denied ride-sharing companies' motions for summary judgment on similar issues, holding that whether drivers are employees or independent contractors is a factual question for a jury.  *See, e.g.*, *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1081-82 (N.D. Cal. 2015) (holding that whether Lyft drivers are employees or independent contractors is for a "jur[y] to decide" under California law); *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1153 (N.D. Cal. 2015) (holding that Uber drivers are "presumptive employees," but that the ultimate issue of classification depends on disputed factual issues).

condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157 (emphasis added).[19]

The FAA provides that valid written arbitration agreements shall be enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2. It is well-established that illegality is an affirmative defense to contract enforcement.  The question is thus whether the class-action waiver is illegal under the NLRA.[20]

### (1)    *D.R. Horton* **and Related Cases**

For some time, the National Labor Relations Board has taken the position that class-action waivers violate the NLRA.  Until May 2016, that argument had been rejected by every circuit court (and the overwhelming majority of district courts) that had considered it.

For example, in *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344 (5th Cir. 2013), the plaintiff signed a class-action waiver as part of his conditions of employment with Horton.  He later filed a class action on behalf of the company's superintendents, alleging that it had misclassified them as exempt from overtime under the Fair Labor Standards Act ("FLSA").  *Id.* at 349.  After Horton responded that the arbitration agreement barred class actions, plaintiff then filed a charge with the NLRB alleging unfair labor practices against Horton, claiming that the class-action waiver violated the NLRA.  *Id.*  The NLRB concluded that the arbitration agreement violated Section 8(a)(1) of the NLRA because it required employees to waive their right to maintain joint,

---

[19] Section 8(a)(1) of the NLRA, which defines unfair labor practices by an employer, provides:  "[i]t shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title . . . ."  29 U.S.C. § 158(a).  The claim here is that Lyft committed an unfair labor practice under Section 8 by requiring Bekele to agree not to act in concert in administrative and judicial proceedings.

[20] Bekele also contends that the Supreme Court's decisions in *Concepcion* and *Italian Colors* do not extend to the employment context.  Accordingly, he contends that class-action waivers are illegal under state law.  Based on the Court's reading of those cases, the Supreme Court hinted at no such limitation, nor is the Court aware of any court that has adopted that argument.

class, or collective employment-related actions in any forum. *Id.*

Horton appealed to the Fifth Circuit, which reversed the NLRB's decision.[21]  The court held that the NLRA does not grant employees the *substantive* right to adjudicate claims collectively.  *See id.* at 356-60 ("The [FAA] savings clause is not a basis for invalidating the waiver of class procedures in the arbitration agreement.").  The court highlighted what it perceived to be a faulty assumption in the NLRB's reasoning:

> The use of class action procedures . . . is not a substantive right. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612-13 (1997); *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 332 (1980) ("[T]he right of a litigant to employ Rule 23 is a procedural right only, ancillary to the litigation of substantive claims."). . . .  The Board distinguished such caselaw on the basis that the NLRA is essentially *sui generis*.  That act's fundamental precept is the right for employees to act collectively.  Thus, Rule 23 is not the source of the right to the relevant collective actions.  The NLRA is.

*Id.* at 357.  The court noted "numerous decisions holding that there is no [substantive] right to use class procedures under various employment-related statutory frameworks," *id.*, including the ADEA and the FLSA.  It also concluded that "[n]either the NLRA's statutory text nor its legislative history contains a congressional command against application of the FAA," or its presumption that written arbitration agreements are enforceable according to their terms.  *Id.* at 361.  Furthermore, it noted that the NLRA's text "does not explicitly provide for . . . collective

---

[21] The court summarized the NLRB's holding as follows:

[T]he Board held that the NLRA protects the right of employees to "join together to pursue workplace grievances, including through litigation" and arbitration.  The Board concluded that an "individual who files a class or collective action regarding wages, hours or working conditions, whether in court or before an arbitrator, seeks to initiate or induce group action and is engaged in conduct protected by Section 7 . . . central to the [NLRA's] purposes."  In the Board's opinion, by requiring employees to refrain from collective or class claims, the Mutual Arbitration Agreement infringed on the substantive rights protected by Section 7.

*Id.* at 355.

action[s], much less the procedures such an action would employ." *Id.* at 360.[22]

> The court concluded as follows:
>
> The NLRA should not be understood to contain a congressional command overriding application of the FAA. The burden is with the party opposing arbitration, *Gilmer*, 500 U.S. at 26, and here the Board has not shown that the NLRA's language, legislative history, or purpose support finding the necessary congressional command. Because the Board's interpretation does not fall within the FAA's "saving clause," and because the NLRA does not contain a congressional command exempting the statute from application of the FAA, the Mutual Arbitration Agreement must be enforced according to its terms.
>
> . . . . We add that we are loath to create a circuit split. Every one of our sister circuits to consider the issue has either suggested or expressly stated that they would not defer to the NLRB's rationale, and held arbitration agreements containing class waivers enforceable. *See Richards v. Ernst & Young, LLP*, 734 F.3d 871, 873-74 (9th Cir. 2013); *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 297-98 n.8 (2d Cir. 2013); *Owen v. Bristol Care, Inc.*, 702 F.3d 1050, 1055 (8th Cir. 2013).

*Id.* at 362.[23]

In *Richards*, the Ninth Circuit rejected a plaintiff's attempt to raise the NLRB's decision

in *D.R. Horton* for the first time on appeal. 744 F.3d at 1075. Nonetheless, in a footnote, it

explained:

> Without deciding the issue, we also note that the two courts of appeals, and the overwhelming majority of the district courts, to have considered the issue have determined that they should not defer to the NLRB's decision in *D.R. Horton* on the ground that it conflicts with the explicit pronouncements of the Supreme Court concerning the policies undergirding the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16.

*Id.* at 1075 n.3 (footnote citing cases omitted). In *Sutherland*, the Second Circuit concluded that

---

[22] As to the NLRA's legislative history, the court concluded that it would be odd for the NLRA, which was enacted in 1935 and reenacted without substantive changes in 1947, to evince a congressional intent to bar class-action waivers in arbitration agreements, when modern class-action practice did not develop until 1966. *See id.* at 362 ("We find limited force to the argument that there is an inherent conflict between the FAA and NLRA when the NLRA would have to be protecting a right of access to a procedure that did not exist when the NLRA was (re)enacted.").

[23] The Ninth Circuit amended its first decision in *Richards*, 734 F.3d 871, with a superseding decision. 744 F.3d 1072. The court's discussion of *D.R. Horton* was not changed.

"Supreme Court precedents [in *Concepcion* and *Gilmer*] inexorably lead to the conclusion that the waiver of collective-action claims is permissible in the FLSA context."  726 F.3d at 297 & n.8.  In *Owen*, the Eight Circuit held that class waivers in arbitration agreements are enforceable in FLSA cases.  702 F.3d at 1054-55.  In *Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1336 (11th Cir. 2014), the Eleventh Circuit concluded that Section 16(b) of the FLSA does not provide for a non-waivable, substantive right to bring a collective action, and cited the Fifth Circuit's decision in *D.R. Horton* with approval.  Finally, in 2015, the Fifth Circuit again reversed an NLRB decision finding that a class-action waiver violated the NLRA.  *Murphy Oil USA, Inc. v. NLRB*, 808 F.3d 1013, 1018 & n.3 (5th Cir. 2015).

### (2)   *Lewis*

The principle that class-action waivers in arbitration agreements did not violate the NLRA was settled law until the Seventh Circuit's recent decision in *Lewis v. Epic Systems Corp.*, 823 F.3d 1147 (7th Cir. 2016).  Indeed, Bekele admits in his supplemental memorandum that he did not even raise the issue previously because the NLRB's reasoning in *D.R. Horton* had been consistently rejected by the Fifth Circuit and "a number of courts."  (Pl. Supp. Mem. 2 n.2).

In *Lewis*, the Seventh Circuit affirmed a district court's denial of an employer's motion to compel arbitration, concluding that the class-action waiver in its arbitration agreement violated Sections 7 and 8 of the NLRA, and was therefore unenforceable under the FAA's savings clause. *Lewis*, 823 F.3d at 1151.  The plaintiff in *Lewis* challenged an arbitration provision that his employer sent to him by e-mail.  *Id.*  The agreement was deemed to have been accepted by the employee if he continued to work at Epic.  *Id.*  When the plaintiff later had a dispute with Epic, rather than proceeding through arbitration, he filed suit in federal court under the FLSA for misclassification and unlawful failure to pay for overtime.  *Id.*  Epic filed a motion to dismiss

and compel arbitration, which the district court denied, concluding that the arbitration clause

violated the NLRA because it interfered with employees' right to engage in concerted activities

for mutual aid and protection. *Id.*

The Seventh Circuit agreed with the district court, becoming the first circuit court to hold

that class-action waiver provisions in arbitration agreements violate the NLRA. After citing

Sections 7 and 8 of the NLRA, the court stated that "Section 7's 'other concerted activities' have

long been held to include 'resort to administrative and judicial forums.'" *Id.* at 1152 (quoting

*Eastex, Inc. v. NLRB*, 437 U.S. 556, 566 (1978)). The court explained:

> Similarly, both courts and the Board have held that filing a collective or class
> action suit constitutes "concerted activit[y]" under Section 7. This precedent is in
> line with the Supreme Court's rule recognizing that even when an employee acts
> alone, she may "engage in concerted activities" where she "intends to induce
> group activity" or "acts as a representative of at least one other employee."

*Id.* (citations omitted).

The court further stated that "Section 7's text, history, and purpose support" the rule that

an employee's ability to file a collective action is a "concerted activit[y] for the purpose of

collective bargaining or other mutual aid or protection." *Id.* It noted that while the NLRA did

not define "concerted activities," collective or class legal proceedings "fit well" within the

ordinary understanding of that term. *Id.* at 1153. It also stated that "[t]he NLRA's history and

purpose confirm that the phrase 'concerted activities' in Section 7 should be read broadly to

include resort to representative, joint, collective, or class legal proceedings." *Id.* The court

stated:

> Congress recognized that, before the NLRA, "a single employee was helpless in
> dealing with an employer," and "that union was essential to give laborers
> opportunity to deal on an equality with their employer." *NLRB v. Jones &
> Laughlin Steel Corp.*, 301 U.S. 1, 33 (1937). In enacting the NLRA, Congress's
> purpose was to "to equalize the bargaining power of the employee with that of his
> employer by allowing employees to band together in confronting an employer

> regarding the terms and conditions of their employment." *City Disposal Sys.*, 465
> U.S. at 835.  Congress gave "no indication that [it] intended to limit this
> protection to situations in which an employee's activity and that of his fellow
> employees combine with one another in any particular way." *Id.*

*Id.*  As to the argument that Rule 23 class-action procedures did not exist at the time that

Congress enacted the NLRA, the court stated that it was "not persuaded":

> First, by protecting not only employees' "right to self-organization, to form, join,
> or assist labor organizations, [and] to bargain collectively through representatives
> of their own choosing" but also "*other* concerted activities for the purpose
> of . . . other mutual aid or protection,"  Section 7's text signals that the activities
> protected are to be construed broadly.  29 U.S.C. § 157 (emphasis added); *see*
> *City Disposal Sys.*, 465 U.S. at 835.  There is no reason to think that Congress
> intended the NLRA to protect only "concerted activities" that were available at
> the time of the NLRA's enactment.

*Id.* at 1154.  The court also contended that collective procedures had existed for years before the

NLRA:

> Second, the contract here purports to address all collective or representative
> procedures and remedies, not just class actions.  Rule 23 may have been yet to
> come at the time of the NLRA's passage, but it was not written on a clean slate.
> Other class and collective procedures had existed for a long time on the equity
> side of the court:  permissive joinder of parties, for instance, had long been part of
> Anglo-American civil procedure and was encouraged in 19th-century federal
> courts.  As early as 1853, it was well-established that representative suits were
> appropriate where the parties interested are numerous, and the suit is for an object
> common to them all.  In fact, representative and collective legal procedures have
> been employed since the medieval period.  The FLSA itself provided for
> collective and representative actions when it was passed in 1938.

*Id.* (citations and internal quotation marks omitted).

Thus, the court concluded that the protections of the NLRA encompass class-action

proceedings:

> Congress was aware of class, representative, and collective legal proceedings
> when it enacted the NLRA.  The plain language of Section 7 encompasses them,
> and there is no evidence that Congress intended them to be excluded.  Section 7's
> plain language controls, and protects collective legal processes.  Along with
> Section 8, it renders unenforceable any contract provision purporting to waive
> employees' access to such remedies.

*Id.* (citations omitted).  Based on that interpretation of Section 7, the court held that Epic's

arbitration provision impinged on rights protected by the NLRA.  *See id.* at 1154-55.  The court

then noted that the FAA

> confirms that agreements to arbitrate "shall be valid, irrevocable, and enforceable,
> save upon such grounds as exist at law or in equity for the revocation of any
> contract."  9 U.S.C. § 2.  Illegality is one of those grounds.  *See Buckeye Check
> Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006) (noting that illegality is a
> ground preventing enforcement under § 2).  The NLRA prohibits the enforcement
> of contract provisions like Epic's, which strip away employees' rights to engage
> in "concerted activities."  Because the provision at issue is unlawful under Section
> 7 of the NLRA, it is illegal, and meets the criteria of the FAA's saving clause for
> nonenforcement.  Here, the NLRA and FAA work hand in glove.

*Id.* at 1157.[24]

Finally, addressing the counterargument that class-action rights are procedural rather than

substantive, the court observed:

> The right to collective action in Section 7 of the NLRA is not, however, merely a
> procedural one.  It instead lies at the heart of the restructuring of
> employer/employee relationships that Congress meant to achieve in the statute.
> That Section 7's rights are "substantive" is plain from the structure of the NLRA:
> Section 7 is the NLRA's only substantive provision.  Every other provision of the
> statute serves to enforce the rights Section 7 protects. Compare 29 U.S.C. § 157
> with *id.* §§ 151-169.  One of those rights is "to engage in . . . concerted activities
> for the purpose of collective bargaining or other mutual aid or protection," *id.*
> § 157; "concerted activities" include collective, representative, and class legal
> proceedings.

*Id.* at 1160 (citations omitted).[25]

### (3)   Discussion

The dispute between the circuits (and, by extension, Lyft and Bekele) hinges on

---

[24] The Seventh Circuit criticized the Fifth Circuit for "go[ing] out looking for trouble" by not attempting to harmonize the FAA and NLRA.  *Id.* at 1158.  It addressed the weight of authority standing against its decision by stating that the Eighth Circuit in *Owen*, the Second Circuit in *Sutherland*, and the Ninth Circuit in *Richards* did not "engage[] substantively with the relevant arguments."  *Id.* at 1159.

[25] On July 29, 2016, Judge Young of this District issued an opinion adopting the reasoning of the Seventh Circuit in *Lewis*.  *See Tigges v. AM Pizza, Inc.*, 2016 WL 4076829, at *13 (D. Mass. July 29, 2016).

essentially one issue:  whether an employee's ability to bring a class action, either in court or arbitration, is a substantive, non-waivable right—that is, "concerted activit[y]" protected by Section 7 of the NLRA.  If it is, Lyft's class-action waiver is an illegal restraint on that right and invalid under the FAA.  If it is not, the arbitration agreement must be enforced according to its terms.  For the following reasons, the Court disagrees with the Seventh Circuit's analysis in *Lewis*, and concludes that the class-action waiver is valid.

To begin, it is clear that employer-employee arbitration agreements, like all other arbitration agreements, must be enforced according to their terms unless a recognized exception applies.  *See Soto-Fonalledas*, 640 F.3d at 474.  The Supreme Court has recognized only three exceptions:  (1) where a waiver excludes not only certain procedural vehicles, but also the underlying substantive rights even in arbitration proceedings; (2) where the arbitration agreement is subject to a generally applicable basis for revoking a contract; or (3) where Congress has issued a clear contrary command.  *See Italian Colors Rest.*, 133 S. Ct. at 2309-10.  Only the second exception is relevant here.

The holding in *Lewis* rests on the following syllogism:

1.  Under the FAA, general contract defenses that would make any contract unenforceable also would make arbitration provisions unenforceable;

2.  One well-established contract defense is illegality;

3.  It is illegal under Section 8(a)(1) of the NLRA to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7] of the NLRA";

4.  Collective legal adjudication is a non-waivable, substantive right under the "other concerted activities" language of Section 7 of the NLRA; and

5.      Therefore, an arbitration provision waiving that right is unenforceable under the

FAA.

The critical misstep in that logic is at the fourth step.  The *Lewis* court stated that

"Section 7's text, history, and purpose" support the conclusion that an employee's ability to

bring a collective action against his employer is "other concerted activit[y]" protected by Section

7.  *Lewis*, 823 F.3d at 1152.  However, a fair reading of the statutory text, using well-established

principles of statutory construction, in fact leads to the opposite conclusion.

The NLRA does not provide a definition of "concerted activities."  The Seventh Circuit

in *Lewis* supplied its own, relying in large part on a dictionary definition:  the term "concerted

activities" means "jointly arranged . . . actions taken by a group in order to achieve their aims."

*Id.* at 1153.  Concluding that class actions "fit well" within that very broad definition, the *Lewis*

court then moved on to consider other, non-textual, interpretive methods.

But the starting point, and normally the ending point, for construing a statute is the words

of the statute itself.  That analysis must take into account not only the specific words at issue, but

also the textual context in which they appear.  In the words of the Supreme Court:

> Whether a statutory term is unambiguous . . . does not turn solely on dictionary
> definitions of its component words.  Rather "the plainness or ambiguity of
> statutory language is determined not only by reference to the language itself, but
> as well by the specific context in which that language is used, and the broader
> context of the statute as a whole."

*Yates v. United States*, — U.S. —, 135 S. Ct. 1074, 1081-82 (2015) (alterations omitted)

(quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)) (explaining that dictionary

definition of "tangible object" did not resolve statute's vagueness, and that context and canons of

construction were important in determining meaning); *see also Deal v. United States*, 508 U.S.

129, 132 (1993) (noting that it is a "fundamental principle of statutory construction . . . that the

meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used").

The actual language of Section 7, including its caption, is as follows:

Right of employees as to organization, collective bargaining, etc.

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in *other concerted activities* for the purpose of collective bargaining or other mutual aid or protection, . . . .

29 U.S.C. § 157 (emphasis added).

The statute thus enumerates three specific rights (to self-organization; to form, join, or assist labor organizations; and to bargain collectively through representatives of their own choosing) followed by a general phrase.  That statutory construct is a common one, and subject to the long-established canon of statutory construction known as *ejusdem generis* ("of the same kind or class").

The *ejusdem generis* canon applies where a list of specific items is followed by a general or catchall phrase, especially where introduced by the word "other."  *See Yates*, 135 S. Ct. at 1086 (Ginsburg, J.); *Christopher v. SmithKline Beecham Corp.*, — U.S. —, 132 S. Ct. 2156, 2171 (2012) (Alito, J.).  According to the canon, "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Washington State Dept. of Social & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) (internal quotation marks omitted); *see Cleveland v. United States*, 329 U.S. 14, 18 (1946) ("Under the *ejusdem generis* rule of construction[,] the general words [other concerted activities] are confined to the class [of preceding specific words] and may not be used to enlarge it.").

For example, in *Begay v. United States*, 553 U.S. 137, 142-43 (2008), the Supreme Court

relied on the *ejusdem generis* canon to determine what crimes were covered by the statutory

phrase "any crime . . . that . . . is burglary, arson, or extortion, involves use of explosives, or

otherwise involves conduct that presents a serious potential risk of physical injury to another."

According to the Court, the enumeration of specific crimes, indicated that the "otherwise

involves" provision covered "only *similar* crimes, rather than *every* crime that 'presents a serious

potential risk of physical injury to another.'" *Id.* at 142.  As the Court explained, "[h]ad

Congress intended the latter 'all encompassing' meaning, it is hard to see why it would have

needed to include the [specific] examples at all." *Id.*  In other words, courts "typically use

*ejusdem generis* to ensure that a general word will not render specific words meaningless." *CSX*

*Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277, 295 (2011); *accord Circuit City*

*Stores*, 532 U.S. at 114-15.

 The NRLA—which uses the phrase "other concerted activities" after a list of specific

enumerated rights—is a classic example of a statute subject to the *ejusdem generis* canon.  In

Section 7, the specific terms that give "other concerted activities" meaning are the "right to self-

organization," the right to "form, join, or assist labor organizations," and the right "to bargain

collectively through representatives of their own choosing."  29 U.S.C. § 157.  If the term "other

concerted activities" were interpreted so broadly as to capture all "jointly arranged . . . actions

taken by a group in order to achieve their aims," the language setting forth three specific rights

would be entirely superfluous.  Under the *ejusdem generis* canon, the term "other concerted

activities" thus must be interpreted to mean other concerted activities of a similar type as the

three enumerated activities.  That would include, for example, such collective employee actions

as picketing or organizing boycotts.  *See, e.g.*, *Retail Prop. Trust v. United Bhd. of Carpenters &*

*Joiners of Am.*, 768 F.3d 938, 950 (9th Cir. 2014) ("Section 7 protects the right of

employees ' . . . to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection,' 29 U.S.C. § 157, including the right to conduct pickets and consumer boycotts.").  It would not, however, include an employee's ability to bring a class-action lawsuit under Fed. R. Civ. P. 23, which is of a different class or character than the enumerated rights.  Rule 23 provides a procedural vehicle for all persons to use to assert certain types of claims, not a substantive right of employees to act collectively in the labor marketplace.

There are two exceptions to the *ejusdem generis* canon, neither of which applies here.  First, the rule cannot be employed to "obscure and defeat the [otherwise clear] intent and purpose of Congress."  *United States v. Alpers*, 338 U.S. 680, 682 (1950).  To say the least, it is far from clear that Congress's intent in enacting the NLRA was to prevent an employee from freely waiving his right to bring a Rule 23 class action, a right that did not exist when the NLRA was enacted.  Second, it cannot "render general words meaningless."  *Id*.  The application of the e*jusdem generis* canon to the NLRA does not render the general phrase "other concerted activities" meaningless, that is, superfluous in light of the preceding specific terms.  Again, the NLRA protects collective employee activities—such as labor picketing and boycotts—that are not enumerated in Section 7's specific list, but instead fall under "other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

Put simply, it is clear from the text of the NLRA that an employee's ability to bring a class action against his employer under Rule 23 is not a substantive right protected by the statute.  Rather—just as it is for every other type of plaintiff—it is a procedural vehicle by which an employee may seek to enforce a substantive right.  As the Supreme Court has stated, "the right of a litigant to employ [a class action under Rule 23] is a procedural right only, ancillary to the litigation of substantive claims."  *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 332 (1980).

37

It also recently stated that "congressional approval of Rule 23 [does not] establish an entitlement to class proceedings for the vindication of statutory rights." *Italian Colors Rest.*, 133 S. Ct. at 2309.  Furthermore, it has "rejected" the argument "that federal law secures a nonwaivable opportunity to vindicate federal policies by satisfying the procedural structures of Rule 23 or invoking some other informal class mechanism in arbitration." *Id.* at 2310 (citing *Concepcion*, 563 U.S. at 343-44).

Here, Bekele's substantive claim is based on improper classification under the Massachusetts Wage Act.  He seeks to vindicate that claim through the filing of a class-action lawsuit.  However, he freely waived his right to use that procedural vehicle as a condition for becoming a Lyft driver.  Accordingly, he must seek a remedy for his substantive claim in the process he contracted for:  individual binding arbitration.

Finally, it should be noted that the Seventh Circuit's holding in *Lewis* would lead to consequences that are both odd and surely unintended.  For example, the court states that "just as the NLRA is not Rule 23, it is not the ADEA or the FLSA.  While the FLSA and ADEA allow class or collective actions, they do not guarantee collective process. . . .  The NLRA does." *Lewis*, 823 F.3d at 1161.  That statement suggests that the NLRA (rather than Rule 23 or the collective-action procedures in the ADEA and FLSA) is an independent source of an employee's substantive right to bring class actions, indeed guarantees that right.  If that is true—and employees need only pursue "mutual aid and protection," 29 U.S.C. § 157, to assert that right—it would appear that such employees need not satisfy the numerosity, commonality, typicality, and adequacy requirements of Rule 23 to certify a class.  But that cannot be correct, given the Supreme Court's strict interpretation of the Rule 23 requirements.  Moreover, Section 8 of the NLRA prohibits not only those employer actions that prohibit the exercise of a Section 7 right,

but also those that "interfere with" or "restrain" it.  29 U.S.C. § 158.  If the ability to pursue a class action is a substantive right protected by Section 7, could an employer oppose class certification without "interfer[ing] with" that right?  Would the filing of an opposition to class certification automatically amount to a violation of Section 8?

That is not the only odd consequence of the Seventh Circuit's decision.  Congress provided an *express* collective-action provision in the FLSA.  *See* 29 U.S.C. § 216(b).  Nonetheless, multiple circuits have held that arbitration agreements containing waivers of that procedural right are enforceable under the FAA.  *See Walthour*, 745 F.3d at 1335 (noting that the FLSA "does not set forth a non-waivable substantive right to a collective action"); *Sutherland*, 726 F.3d at 297 n.6 ("Our conclusion that nothing in the text of the FLSA prevents an employee from waiving his or her ability to proceed collectively under the FLSA is reinforced by our earlier decision referring to the FLSA collective action right as a procedural mechanism.  We have previously explained that the procedural right to proceed collectively presupposes, and does not create, a non-waivable, substantive right to bring such a claim." (citations and internal quotation marks omitted)); *Owen*, 702 F.3d at 1052 (noting that plaintiff "identifies nothing in either the text or legislative history of the FLSA that indicates a congressional intent to bar employees from agreeing to arbitrate FLSA claims individually").  It would be strange to conclude that Congress included an express—but waivable—procedural right to collective actions in the FLSA, but intended to imply a stronger—not waivable—substantive right to class actions in the NLRA's broad "concerted activities" language.

For the foregoing reasons, the Court concludes that Lyft's arbitration provision is enforceable under the FAA because its class-action waiver is not illegal under the NLRA.

Accordingly, Bekele must proceed to individual arbitration if his claims fall within the scope of the arbitration agreement.[26]

### C.     Scope

Bekele does not contest that if the arbitration agreement is valid and enforceable, his claim under the Massachusetts Wage Act falls within the broad scope of the arbitration agreement.  The question of whether a particular dispute is within the class of those disputes governed by the arbitration clause is a matter of federal law.  *See United States ex rel. Hagerty v. Cyberonics, Inc.*, 146 F. Supp. 3d 337, 347 (D. Mass. 2015).  The use of phrases such as "arising under" or "arising out of" in an arbitration provision generally indicates an intent to arbitrate a broad scope of claims.  *See id.* (collecting cases).  "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone*, 460 U.S. at 24-25.  The provision that Bekele agreed to states that he and Lyft

> agree that any legal disputes or claims arising out of or related to the Agreement (including but not limited to the use of the Lyft Platform and/or the Services, or the interpretation, enforceability, revocability, or validity of the Agreement, or the arbitrability of any dispute), that cannot be resolved informally shall be submitted to binding arbitration . . . .

(Still Decl. Ex. 3 at 22).  Bekele's claim that he has been wrongfully classified as an independent contractor falls within the broad scope of that language.

### D.     Stay or Dismissal

The remaining question is whether to stay the case pending arbitration or to dismiss it.  "Where one side is entitled to arbitration of a claim brought in court, in this circuit a district court can, in its discretion, choose to dismiss the lawsuit, if *all* claims asserted in the case are

---

[26] Were a court to decide that the class-waiver provision here was illegal, it would have to decide whether the severability clause saves the remainder of the arbitration provision or if the entire provision is permeated by the class waiver's illegality.

found arbitrable." *Next Step Med. Co., Inc. v. Johnson & Johnson, Int'l*, 619 F.3d 67, 71 (1st Cir. 2010). Bekele's only claim is arbitrable. Accordingly, the case will be dismissed, "with recognition that as a collateral aspect of that disposition, this decision is immediately appealable to permit plaintiffs a timely opportunity to challenge it [before the First Circuit] if they so choose." *Cullinane*, 2016 WL 3751652, at *10.[27]

## IV.  Conclusion

For the foregoing reasons, defendant's motion to compel arbitration and to dismiss the complaint is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated:  August 9, 2016                                     United States District Judge

---

[27] *See Green Tree Fin. Corp.-Alabama*, 531 U.S. at 86-87 (noting that a district court's decision to dismiss a case was a "final decision within the meaning of § 16(a)(3) [of the FAA], and an appeal may be taken," and that, "[h]ad the District Court entered a stay instead of a dismissal in this case, that order would not be appealable" under § 16(b)(1)).